1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9               **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   JANET LANE,                            No. CIV S-07-1308-GEB-CMK

12              Plaintiff,

13         vs.                        <u>FINDINGS AND RECOMMENDATIONS</u>

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                Defendant.
16
     _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pending before the court are plaintiff's motion for summary judgment (Doc. 16) and defendant's

21   cross-motion for summary judgment (Doc. 17).   With her motion for summary judgment,

22   plaintiff has submitted recent medical records which were not before the agency.  Plaintiff also

23   filed supplemental briefs and additional new evidence (Docs. 18 and 20).  Defendant opposes the

24   consideration of any evidence not originally before the agency.

25   / / /

26   / / /

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on June 18, 2003.  In the application, plaintiff claims that disability began on February 2, 2001.  In her motion for summary judgment, plaintiff claims that disability is caused by a combination of:  ". . . osteoarthritis knees and hands, left shoulder strain, left supraspinatus tendon tear, left rotator cuff tear, bilateral carpal tunnel syndrome, bilateral shoulder impingement, fibrositis, fibromyalgia, gastroesophageal reflux disease ("GERD"), sinusitis, allergic rhinitis, asthma, anxiety, depression, and anxiety related disorders."  She claims these impairments prevent her from performing sustained work at any level of exertion.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on December 16, 2004, before Administrative Law Judge ("ALJ") Theodore T.N. Slocum.   In an April 5, 2005, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1.   The claimant's status post bilateral rotator cuff repair, fibromyalgia, mild osteoarthritis of her knees, carpal tunnel syndrome versus cubital tunnel syndrome with negative findings on testing, and obesity, are considered "severe" . . .;

2.   These medically determinable impairments do not meet or medically equal one of the listed impairments . . .;

3.   The claimant's allegations regarding her limitations are not totally credible. . .;

4.   The claimant has the following residual functional capacity:  lift/carry 20 pounds occasionally and ten pounds frequently; sit, stand, or walk about six out of eight hours; occasionally climb, stoop, kneel, crouch, and crawl; never climb ropes or scaffolds; and occasionally reach overhead;

5.   The claimant is unable to perform past relevant work;

6.   The claimant is a "younger individual" and has "more than a high school . . . education";

7.   Plaintiff's residual functional capacity is not eroded by any non-exertional limitations;

/ / /

/ / /

8.      The claimant has the residual functional capacity to perform the full range of light work;[1] and

9.      Based on application of the Grids, claimant is not disabled.

On December 19, 2005, the Appeals Council permitted plaintiff to submit new evidence.  The Appeals Council subsequently acknowledged receipt of Exhibits AC-1 through AC-5.  After the Appeals Council declined review on May 31, 2007, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

### A.      Evidence Before the Agency

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:[2]

July 5, 2000 – Plaintiff was examined by Dale Smith, M.D., in relation to possible kidney stones.  See CAR 541-42.  Dr. Smith found normal function on the right side, but "high grade obstructive process" on the left.  Dr. Smith's plan was to perform an endoscopic stone removal that evening or the next day.

November 14, 2000 – Plaintiff sustained a work-related injury to her shoulders.

November 21, 2000 – Plaintiff was evaluated by physical therapist Piotr Serek for treatment following her shoulder injury.  See CAR 358.  The therapist noted a severe decreased range of motion and decreased strength.

/ / /

/ / /

/ / /

---

[1]      Plaintiff incorrectly states in her motion that the ALJ concluded she could only do sedentary work.

[2]      The records summarized include records available to the ALJ at the time he rendered his decision and records submitted after the ALJ's decision for consideration by the Appeals Counsel.

1    January 31, 2001 – Plaintiff was evaluated by rheumatologist Diana Lau, M.D.,

2  incident to "generalized arthralgias."  See CAR 514-15.  Dr. Lau's notes indicate that plaintiff "is

3  currently working in the warehouse."  On physical examination, the doctor noted full cervical

4  range of motion, but decreased range of motion in the shoulders.  Plaintiff's elbows were intact

5  and no acute effusion or erythema was noted in the knees.

6    February 2, 2001 – Plaintiff claims she became unable to work.

7    May 8, 2001 – Plaintiff underwent a left shoulder arthroscopy, left subacromial

8  decompression, and mini-open rotator cuff repair procedure, performed by Michael Petersen,

9  M.D., of Woodland Healthcare.  See CAR 354.

10    December 5, 2001 – Plaintiff underwent a right shoulder arthroscopy, right

11  subacromial decompression, and min-open rotator cuff repair procedure, performed by Dr.

12  Petersen.  See CAR 337-38.  Dr. Petersen's operative notes indicate that plaintiff "has done well"

13  since prior procedures on plaintiff's left side.

14    June 4, 2002 – Dr. Lau reported on a follow-up rheumatology consultation.  See

15  CAR 447-48.  The doctor reported:

16    . . . Patient has a history of persistent arthralgias on her hands. . . .  Overall,
     she is doing much better.  At the present time she has very minimal
17    discomfort.  She had successful surgery on her shoulders.  Her knees also
     have improved.  She no longer has significant pain.  She is currently taking
18    ibuprofen as needed for symptomatic relief.  She also was found to have
     slight[] depression and was started on some antidepressant.  That has been
19    quite helpful to the patient.  She is quite happy with her current clinical
     improvement.

20

21    July 12, 2002 – Dr. Petersen reported in a worker's compensation report that

22  plaintiff ". . . has full motion of her left shoulder with excellent strength and no weakness . . ."

23  and that, on the right, ". . .she also has near full motion except for a slight decrease in internal

24  rotation."  See CAR 444-45.  Dr. Petersen noted some pain when plaintiff rotated her neck.

25  / / /

26  / / /

4

1    August 23, 2002 – Dr. Petersen prepared a worker's compensation report. See

2  CAR 438-39.  He stated that plaintiff's range of motion was full in the left shoulder without pain,

3  and "near full" on the right.  As to her functional capacity, the doctor opined that plaintiff could

4  not lift, push, or pull more than 20 pounds with the right arm and should avoid repetitive

5  reaching above shoulder level on the right.  He stated:  "I reviewed the job description for general

6  office clerk and approved that."

7    September 9, 2002 – Donald W. Seymour, M.D., performed a medical

8  examination of plaintiff as part of a disability evaluation arising from the work injury in

9  November 2000.  See CAR 207-32.  Plaintiff was ". . . evaluated with regard to problems she is

10  having in her neck, upper back, and both shoulders."  According to Dr. Seymour, at the time of

11  the work injury, plaintiff had been working as a "Night Repack-Order Filler."  Dr. Seymour

12  reported that, about a week before her work injury, plaintiff noted the "gradual onset of aching

13  pain in both shoulders, that arose in association with reaching and throwing items into a trash

14  compactor at work."  On the day of the injury, she was lifting a 45-pound "tote" onto a pallet and

15  ". . . experienced an abrupt increase in bilateral shoulder pain."  By February 2001, plaintiff was

16  experiencing pain in the lateral right  side of the neck.

17    As of the date of Dr. Seymour's examination, plaintiff was complaining of "sharp

18  pain in the posterior right neck and interscapular area, as well as bilateral shoulder pain."

19  Plaintiff reported that her pain occurs throughout the day and wakes her at night.  As to

20  limitations imposed by her pain, Dr. Seymour noted:

21         The patient states that she is unable to throw.  She states that she has
           difficulty with driving, walking, climbing or descending stairs, lifting,
22         bending at the neck, pulling, pushing, reaching overhead, turning her head,
           combing her hair, getting up to walk, carrying groceries, opening doors or
23         jars, and performing vigorous activities.  She has no problem with
           squatting, sneezing/coughing, vacuuming, grasping, brushing her teeth,
24         washing her face, bathing, putting on socks, writing, or keyboarding.

25  Plaintiff told Dr. Seymour that lying down and medication provide pain relief.  Plaintiff

26  estimated that she could lift 20 pounds, sit for one to two hours, stand for one to two hours, but

walk only "for minutes."  Plaintiff's treating physician at the time was Dr. Petersen.  Plaintiff's treatment consisted of medication only.  She was not receiving chiropractic treatment or physical therapy.  Her last visit with Dr. Petersen prior to Dr. Seymour's examination was July 2002.

Dr. Seymour's impressions were as follows:

1.  Status post-operative shoulder arthroscopy, with complete bursectomy, subacromial decompression and min-open rotator cuff repair. . . May 8, 2001;

2.  Status post-operative right shoulder arthroscopy, with intra-articular debridement of rotator cuff tear, bursectomy, subacromial decompression and min-open rotator cuff repair . . . December 5, 2001;

3.  Post-operative adhesive capsulitis and chronic tendinitis, both shoulders;

4.  Multilevel cervical degenerative disc disease, by x-ray, July 22, 2002; and

5.  Chronic interscapular stain and sprain.

Dr. Seymour concluded that plaintiff's shoulder, neck, and interscapular conditions were permanent and stationary.  He stated that plaintiff would be precluded from overhead reaching and forceful repetitive pushing or pulling with either upper extremity.

September 26, 2002 – Dr. Petersen prepared a final worker's compensation report.  See CAR 435-36.  He stated that he agreed with Dr. Seymour's conclusions.  The doctor stated that plaintiff continued to report pain on the right but that her left shoulder is "doing pretty well."  As to plaintiff's functional capabilities, Dr. Petersen stated:

. . . She should not do repetitive work above shoulder height on the right.  I think she can lift up to 20 lbs. below shoulder height level.

February 7, 2003 – Treatment notes from Marcia Gollober, M.D., indicate that, on physical examination, there was adenopathy of the neck, no spinal tenderness, no palpable edema of the extremities, and that plaintiff was a "cooperative woman in no pain."  See CAR 426.

///

1       March 14, 2003 – Plaintiff was treated by Dr. Gollober for complaints of neck and

2  spine pain.  See CAR 423.  On physical examination, the doctor noted full range of motion and

3  normal motor strength.  Plaintiff's neck was without palpable tenderness.

4       March 14, 2003 – A vocational rehabilitation progress report indicates that

5  plaintiff "successfully completed her school training rehabilitation program. . . ." and registered

6  with various employment agencies.  See CAR 167.

7       April 10, 2003 – Phillip B. Schmidt, D.C., reported on his chiropractic treatment

8  of plaintiff.  See CAR 233-34.  Plaintiff was being treated for ". . . multiple complaints including

9  neck pain, right trap/shoulder/arm pain, upper back pain, low back pain, chest pain, B/L fifth

10  finger N/T, and insomnia."  Dr. Schmidt diagnosed plaintiff with "status post . . . rotator cuff

11  surgeries (May and December 2001" and "chronic myofascial pain."  Dr. Schmidt did not offer

12  any assessment of plaintiff's residual functional capacity.

13       July 8, 2003 – Records from Woodland Healthcare reveal that plaintiff underwent

14  an endoscopy incident to a pre-operative diagnosis of chronic GERD.  See CAR 312-13.

15       August 8, 2003 – Treatment notes from Dr. Gollober indicate that plaintiff

16  complained of neck pain and was currently taking Darvocet and Celebrex.  See CAR 398.  Dr.

17  Gollober stated:  "[S]he is pressuring me at this time to add another medication," which the

18  doctor did, prescribing Neurontin.

19       August 28, 2003 – Charles Miller, M.D., reported on a complete orthopedic

20  evaluation of plaintiff.  See CAR 235-41.  Plaintiff's complaints included pain in the upper and

21  lower back, neck, hands, feet chest, and right upper extremity.  Based on his physical

22  examination, Dr. Miller concluded that "the patient is within normal limits except limited

23  reaching with right shoulder; all others within normal limits."

24  / / /

25  / / /

26  / / /

1    June 30, 2003 – Plaintiff completed an "Exertional Daily Activities

2 Questionnaire" form.  See CAR 123-26.  Plaintiff stated that she could not stand for long periods

3 of time and, therefore, could not cook other than items that can be prepared in a microwave oven.

4 She stated that pain causes nausea and headaches, and that she experiences swelling which

5 requires her to use a TENS unit and ice packs.  When she does walk it is only out of necessity to

6 go grocery shopping or keep appointments.  She stated that, when she walks she develops pain in

7 her neck and back requiring her to rest for a few hours.  She stated that she can only carry her

8 purse.  When she goes grocery shopping, her daughter assists her.  Plaintiff stated that she needs

9 to sit down every two hours for half-hour breaks.  Generally, she requires up to three-hour breaks

10 laying down two to three times a day.

11    July 8, 2003 – According to statements made by plaintiff's counsel at the

12 administrative hearing, plaintiff underwent an esophageal gastroduodenoscopy with biopsy and

13 dilation on this date.  See CAR 985.

14    September 26, 2003 – Agency consultative doctor Shepard Fountaine, M.D.,

15 completed a physical residual functional capacity assessment based on a review of the medical

16 records.  See CAR 543-52.  The doctor concluded that plaintiff could lift 20 pounds occasionally

17 and 10 pounds frequently and sit/stand/walk for six hours in an eight-hour day.  The doctor also

18 concluded that plaintiff was limited in her ability to push/pull/reach with the right upper

19 extremity.  No postural limitations were noted other than a preclusion to climbing ropes,

20 scaffolds, and ladders.  Other than the limitation as to the right upper extremity, no manipulative

21 limitations were noted.  No visual, communicative, or environmental limitations were noted.

22    October 2, 2003 – Treatment notes from Dr. Gollober indicate that plaintiff

23 reported that she ". . . has developed migratory pain starting in the left shoulder and now it is

24 involved in the right shoulder."  See CAR 391.  Plaintiff reported that it hurt to wear a bra or

25 even to sit up straight.  Plaintiff also reported that Darvocet was no longer working to control her

26 pain.  On physical examination, Dr. Gollober noted three positive trigger points and injected each

8

1  with lidocaine.  The doctor assessed "fibrositis flare" and prescribed Vicodin.

2  October 6, 2003 – Medical records from Woodland Memorial Hospital reveal that

3  plaintiff underwent an operative procedure (Nissen fundoplication) incident to "failed medical

4  therapy for gastroesophageal reflux disease."[3]  See CAR 249-51.  According to the reporting

5  surgeon, plaintiff had a "long-standing gastroesophageal reflux disease for approximately 10

6  years."  The doctor reported that, within the previous six months, plaintiff had been experiencing

7  "dyspepsia, dysphagia, and anorexia."

8  October 17, 2003 – Plaintiff reported to Dr. Gollober that ". . . Vicodin works for

9  her chronic pain in her neck, back, and shoulders. . . ."  See CAR 390.

10  November 6, 2003 – Treatment notes from Dr. Gollober indicate that plaintiff was

11  continuing to complain of pain in the scapular region.  See CAR 387-88.  Dr. Gollober's notes

12  reflect that an MRI of plaintiff's neck was "perfectly normal."  The doctor's treatment plan was

13  to slowly increase plaintiff's medication and re-evaluate in two months.

14  December 16, 2003 – Plaintiff underwent a nerve conduction study.  See CAR

15  376-80.  The reporting doctor noted the following impression:

16      The only abnormality is relative prolongation at the right median
        orthodromic sensory when compared to the ulnar, although in and of itself
17      was at the upper limit of normal.  There was no evidence or even subtle
        abnormality for the ulnar conduction velocity motor or sensory on the right
18      and for the sensory velocity over the left.

19  The doctor felt the studies revealed results "consistent with a very early right carpal tunnel

20  syndrome."

21  December 22, 2003 – Dr. Petersen evaluated plaintiff incident to her complaints

22  of bilateral hand numbness and tingling.  See CAR 378.  On physical examination, Dr. Petersen

23  reported positive Tinel's sign on the right at the carpal tunnel with similar signs at the cubital

24  tunnel.  Findings were negative on the left hand, but positive at the left wrist.  Dr. Petersen

25  _____

26  [3]      It is unclear whether the "failed medical therapy" refers to the July 2003
   procedure.

1   assessed "bilateral ulnar nerve symptoms, most consistent with cubital tunnel syndrome with

2   negative nerve studies."

3              December 28, 2003 – Rodney Collins, M.D., reported on his psychiatric

4   evaluation of plaintiff.  See CAR 284-88.  Dr. Collins reported that plaintiff's chief complaints at

5   the time were back problems, chest pain, carpal tunnel syndrome, and irritable bowel syndrome.

6   As to plaintiff's activities of daily living, Dr. Collins reported:

7              The claimant states that she has very poor sleep.  She awakens 2-3 times at
             night.  She eats one meal a day and feels chronically fatigued during the
8            day.  She does light household chores and is able to dress and bathe
             herself.  She needs assistance with housework, cooking, and shopping.
9
10  Based on his mental status examination, Dr. Collins diagnosed generalized anxiety disorder

11  secondary to plaintiff's physical problems.  He assigned a global assessment of functioning

12  ("GAF") score of 55 out of 100.  He felt that plaintiff could benefit from psychotherapy and that

13  her condition was likely to improve within 12 months.  As to her functional capacity, Dr. Collins

14  stated as follows:

15             In my opinion, this claimant is capable of managing funds in her best
             interest.  She has above average cognitive skills on mental status
16           evaluation, which would allow her to manage funds in her and her family's
             best interest.  This claimant would not have problems performing simple
17           and repetitive tasks in a workplace from an emotional standpoint, nor
             would she have problems with more detailed or complex tasks.  She would
18           also not have problems with accepting instructions from supervisors,
             interacting with coworkers and/or the public on a regular basis.  This
19           claimant in my opinion, would have some difficulties performing her work
             activities on a consistent basis due to her physical and emotional condition
20           and also have difficulty dealing with the usual stresses that are
             encountered in competitive work.
21
             I do not feel that this claimant's psychiatric condition would interfere with
22           her ability to maintain regular attendance in a workplace or complete a
             normal workday or workweek without interruption.
23  / / /

24  / / /

25  / / /

26  / / /

February 5, 2004 – Plaintiff was treated by Dr. Gollober for complaints of chest pain.  See CAR 628-29.  On physical examination, the doctor noted plaintiff's vital signs and observed no reproducable chest pain with chest compression.  In her assessment, Dr. Gollober stated:

> 1.  Chest wall pain related to patient's fibrositis and costochondritis.  I have suggested that she might want to use local patches such as are available over-the-counter.  If this fails, we could consider using Lidocaine patches.  As long as she remains in litigation, I suspect that we will continue to see her in the office with this complaint.

> 2.  Chronic pain seeking SSI. . . .

February 10, 2004 – Agency consultative doctor Rosemary Tyl, M.D., prepared a psychiatric review technique form and mental residual functional capacity assessment.  See CAR 553-70.  The doctor concluded that plaintiff was mildly limited in activities of daily living and in her ability to maintain social functioning.  Dr. Tyl concluded that plaintiff was moderately limited in her ability to maintain concentration, persistence and pace.  She also found that plaintiff was moderately limited in her ability to perform work within a schedule, maintain regular work attendance and punctuality, complete a normal workday and workweek without interruption from psychological problems, and respond appropriately to changes in the work setting.

February 11, 2004 – Agency consultative doctor Thien Nguyen, M.D., prepared a physical residual functional capacity assessment which agreed with Dr. Fountaine's prior assessment from September 2003.  See CAR. 571-82.

February 23, 2004 – Plaintiff was seen by Dr. Petersen incident to complaints of hand numbness and tingling.  See CAR 625.  Dr. Petersen assesed carpal tunnel syndrome and advised plaintiff to use braces when she sleeps.  He stated that, if this did not help, he would consider injections.

/ / /

/ / /

11

1    March 8, 2004 – Plaintiff was evaluated again by Dr. Petersen for bilateral hand

2    numbness and tingling.  See CAR 624.  On physical examination, Dr. Petersen noted minimally

3    positive Tinel's signs over both carpal tunnels.  He administered Celestone and lidocaine

4    injections and instructed plaintiff to continue using splints.  He stated that plaintiff's "symptoms

5    in the ulnar nerve are pretty minimal right now."

6    March 16, 2004 – Plaintiff was treated at Woodland Clinic Medical Group for

7    complaints of epigastric discomfort.  See CAR 621-22.  The treatment notes indicate that

8    plaintiff felt she was doing better since the Nissen fundoplication procedure of October 2003.  It

9    is noted that plaintiff was taking "a lot of ibuprofen in addition to Celebrex for shoulder pain."

10   Plaintiff was instructed to discontinue use of these drugs (which are NSAIDs) because they can

11   cause nausea.  Plaintiff was advised to take Tylenol and continue on her GERD medications.

12   March 19, 2004 – Plaintiff was seen by a physician's assistant for complaints of

13   bilateral hand numbness and tingling.  See CAR 618.  The treatment notes indicate that a

14   December 6, 2003, nerve conduction study was normal.

15   March 31, 2004 – Progress notes from Yolo County Alcohol, Drug, and Mental

16   Health indicate that plaintiff was participating in mental health therapy and approaching the end

17   of the authorized treatment.  See CAR 844.  Plaintiff told the therapist that the limited number of

18   sessions authorized (nine) was too few, but the therapist said that additional sessions could not be

19   authorized.

20   April 9, 2004 – A clinician at Yolo County Alcohol, Drug, and Mental Health

21   prepared a "Discharge Summary."  See CAR 840.  The summary indicates that plaintiff reported

22   with depression and suicidal ideation.  Plaintiff stated she was experiencing feelings of

23   helplessness, anxiety, fatigue, difficulty sleeping, and decreased appetite.  She reported

24   difficulties with her teenage daughters and her social security case.  The summary records that

25   plaintiff attended regular therapy sessions and made progress.  At the time of discharge, plaintiff

26   was diagnosed with dysthymic disorder secondary to physical problems and assigned a GAF

1  score of 49.

2      April 20, 2004 – Plaintiff was treated at Woodland Clinic Medical Group for

3  complaints relating to chronic dyspepsia and GERD symptoms. See CAR 611. Treatment notes

4  reveal that a March 23, 2004, ultrasound was normal and that "[r]esults of the EGAD performed

5  04/06/04 revealed . . . slight gastritis." Plaintiff was instructed to continue with her current

6  GERD medications and to return in one year for a repeat EGAD test.

7      May 12, 2004 – Dr. Lau reported that plaintiff was taking "a lot of Soma." See

8  CAR 606. The doctor advised plaintiff to stop taking Vicodin "since it was not particularly

9  helpful." Dr. Lau concluded that plaintiff's symptoms were consistent with fibromyalgia

10  syndrome.

11      June 10, 2004 – Dr. Lau completed a rheumatology evaluation. See CAR 602.

12  The doctor did not note any abnormal findings on physical examination and stated: "She was

13  complaining of 10/10 pain but she is able to move around with no major difficulty." Plaintiff

14  was put on Lexapro – an antidepressant – in an attempt to control her pain syndrome.

15      June 13, 2004 – Plaintiff's half-sister, Judy Byrd, wrote a letter describing

16  plaintiff's impairments and functional capabilities. See CAR 874-79. The letter discusses pain

17  plaintiff experiences due to fibromyalgia, the side effects of her numerous medications, and the

18  functional limitations in plaintiff's activities of daily living as a result of pain and side effects.

19  The letter also discusses the quality of treatment provided by Dr. Gollober, concluding that the

20  doctor exhibited nothing more than a "'rush you in and out' bedside manner."

21      June 28, 2004 – Treatment notes from Dr. Lau reveal that plaintiff had switched

22  from Dr. Gollober to a different doctor – Liana Turkot – but then switched back because she was

23  unable to obtain Vicodin from Dr. Turkot. See CAR. 598. Both Drs. Gollober and Lau provided

24  plaintiff with Vicodin and other narcotic pain medication.

25  / / /

26  / / /

1          July 8, 2004 – Treatment notes from Dr. Gollober reveal that plaintiff reported

2  that she was "a mess" and had pain "all over."  See CAR 596-97.  The doctor noted that the only

3  differences in plaintiff's medication were the addition of Lexapro and Soma and that plaintiff had

4  been "off of Vicodin for a while."  Dr. Gollober assessed "[f]ibromyalgia out of control" and

5  continued plaintiff on Vicodin and Soma.  The doctor told plaintiff that, in all likelihood, "her

6  best bet will not be more medication. . . ."

7          July 22, 2004 – Dr. Gollober reported that, while plaintiff continued to complain

8  of a host of physical maladies, she "still has no program to take control of her own life."  The

9  doctor noted that plaintiff had been doing part of her daughter's paper route, which was

10  physically demanding work.  On physical examination, the doctor noted only plaintiff's vital

11  signs. Dr. Gollober concluded that plaintiff's fibromyalgia "continues in borderline control."

12          August 11, 2004 – Dr. Lau prepared notes on her rheumatology evaluation of

13  plaintiff.  See CAR 592-93.  On physical examination, the doctor did not note any abnormal

14  findings.  Dr. Lau specifically noted that plaintiff's abdomen was non-tender.  The only pain

15  noted was some mild pain in the left shoulder.  Dr. Lau stated that plaintiff had a long history of

16  chronic pain syndrome.  The doctor reported that antidepressants were not effective for treating

17  her pain syndrome.  Dr. Lau stated that "I really do not have much to offer her at this time."

18          August 24, 2004 – Dr. Gollober reported in treatment notes that plaintiff was

19  complaining of ear pressure, chest wall pain, headaches, muscle spasms, toe pain, and left

20  shoulder pain.  See CAR 591.  On physical examination, Dr. Gollober noted only plaintiff's vital

21  signs.  Dr. Gollober assessed plaintiff with "[f]ibromyalgia out of control as stated by

22  rheumatology."  The doctor did not feel that there were many options remaining given that

23  plaintiff had "failed multiple antidepressants."  Dr. Gollober increased plaintiff's dosage of

24  Neurontin to 900 mg, and indicated that the dosage could be as high as 3,200 mg.  However, the

25  doctor advised plaintiff that long-term use of muscle relaxants was not clinically helpful.

26  / / /

September 27, 2004 – Treatment notes from Woodland Clinic Medical Group indicate that plaintiff denied any bowel or bladder problems.  See CAR 586-87.

December 8, 2004 – Dr. Gollober submitted a letter listing plaintiff's alleged impairments and stating that plaintiff "requires a break of at least 10 minutes every hour."  A list of plaintiff's medical problems and medications accompanied this letter, but no objective findings are noted.

December 16, 2004 – Plaintiff testified at the administrative hearing in this case.  See CAR 973-1004.  Plaintiff was represented by counsel at the hearing.  Plaintiff stated that she last worked in 2001 and that she completed a vocational rehabilitation course in 2003, obtaining two certifications.  She also testified that she tried to return to work in 2003 "and then the fibromyalgia kicked in" and "the acid reflux disease kicked in."  Regarding her functional abilities and limitations, plaintiff testified to the following:

1.   She can stand for only 15-20 minutes due to pain in her neck and back;

2.   She walks for 15 to 25 minutes a day seven days a week helping her daughter with her paper route and, afterwards, she is "just wore out";

3.   She can sit for only 15 minutes at a time;

4.   She does not do any cooking;

5.   She does some limited grocery shopping with the help of her mother;

6.   She drives only when necessary;

7.   She takes naps which are two or three hours long;

8.   Her most serious impairments relate to her legs and hands;

9.   Pain medication is not effective;

10.  She has constant numbness in her hands and the more she uses her hands the worse the numbness becomes;

11.  Her sleep is disturbed due to constant pain;

12.  She suffers from depression due to constant pain;

///

15

13.  Her concentration is "off" and she feels like she is in a "no-zone land" due to side effects of medication; and

14.  Her memory is impaired due to side effects of medication;

January 6, 2005 – Dr. Gollober prepared follow-up notes indicating that plaintiff was now doing some aerobic exercises and walking about one hour per day.  See CAR 898. Plaintiff reported that she was feeling better but "as usual Janet has many aches and pains to complain about."  Medications were continued and plaintiff was given a pass for seven visits to a local pool for aquatic therapy.

January 17, 2005 – Dr. Gollober's notes indicate that, by this time, plaintiff was taking 3,200 mg of Neurontin a day.  See CAR 897.

January 25, 2005 – Plaintiff was treated by Joseph Lash, M.D., for bronchitis.  See CAR 894.

January 27, 2005 – Dr. Gollober's notes indicate that plaintiff reported good results from Pamelor in treating constipation.  See CAR 893.

March 14, 2005 – Treatment notes from Dr. Gollober reflect that plaintiff was, by this time, taking two Norco tablets three times a day.  See CAR 892.

March 17, 2005 – Plaintiff was seen by Dr. Lash with respect to allergic rhinitis. See CAR 906.  Dr. Lash reported that plaintiff had been on immunotherapy for the past nine years for this condition.

May 12, 2005 – Plaintiff's friend, Sara Wachter, wrote a letter discussing plaintiff's impairments and their effects on her functioning.  See CAR 885.  Ms. Wachter also discussed the quality of care provided by Dr. Gollober, concluding that the doctor went "from being a model doctor to a doctor with a bad bedside disposition."

June 3, 2005 – An abdominal x-ray revealed "no calcifications superimposed over the kidney."  See CAR 903.

/ / /

       <u>June 6, 2005</u> – Dr Gollober reported:  "Recently, the patient has had several episodes, calling in, wanting one procedure or another, this referral or another, motivated by herself with questionable medical substantiation."  <u>See</u> CAR 962.

       <u>June 10, 2005</u> – Plaintiff's friend, Stacy Burks, wrote a letter addressing problems plaintiff was having with her youngest daughter and the stress these problems were causing.  <u>See</u> CAR 882-84.  Ms. Burks concludes that plaintiff cannot "work under the amount of pain and stress she is in, let alon[e] all the medication she is taking."

       <u>July 6, 2005</u> – Dr. Gollober's treatment report indicates that plaintiff had run out of Norco because she was taking more per day that her prescription allowed.  <u>See</u> CAR 960. Plaintiff requested a "bridge" prescription to get her to the next regular refill.  Plaintiff reported that she could not do housework or laundry, but stated that Klonipin had helped immensely.

       <u>August 4, 2005</u> – Dr. Gollober reported that plaintiff was taking six Norco tablets per day.  <u>See</u> CAR 959.  The doctor stated:  "She is a little more comfortable but she still finds she can't go shopping for more than about 30 minutes."  Dr. Gollober stated that plaintiff will always have fibromyalgia pain which cannot be controlled with medication and instructed plaintiff to use non-medicinal therapy "such as palates [sic] and yoga, self-hypnosis, and relaxation techniques."  The doctor assessed fibromyalgia under "marginally better control."

       <u>August 22, 2005</u> – Plaintiff was seen by Dr. Gollober for "body aches."  <u>See</u> CAR 954.  Plaintiff reported that her pharmacy switched to generic drugs and that she felt the generic for Norco was nor working as well.  Dr. Gollober stated:  "She is again in to have it increased." The doctor added:

> . . . I have tried over several visits to get her to keep her Norco use down but I am basically very frustrated at this point as I am just simply unable to do it.  She is complaining of pain all over her, her joints hurt, her knees hurt[], her shoulders hurt, it is always the same and never good with her.

Objectively, only plaintiff's vital signs are reported.  Dr. Gollober assessed a fibromyalgia flare-up, "though I cannot account for this."  Dr. Gollober increased Norco to 10 tablets per day.

1         September 19, 2005 – Clinic notes from Woodland Healthcare reveal that plaintiff

2     "has minimal symptoms of GERD, reflux, or abdominal discomfort."  See CAR 953.

3         November 2, 2005 – Plaintiff was seen again by Dr. Gollober for chronic pain.

4     See CAR 956-57.  Dr. Gollober reported:

5         . . . She continues with multiple somatic complaints.  Functionally she is
      able to go to the market every couple of weeks.  She drives and is still
6     participating with her daughter in her paper route which takes her out
      walking about 1.5 hours a day.  She continues with very high narcotic
7     needs and has been very resistant to withdrawal of narcotics in the past.

8     Plaintiff denied over sedation due to drugs.  Despite stating that she would like to wean plaintiff

9     from narcotic pain medications, Dr. Gollober refilled plaintiff's prescriptions.

10    **B.**   **New Evidence**

11        Plaintiff has submitted in this court new evidence which was never before the ALJ

12    or Appeals Council.  Plaintiff essentially asks the court to remand the case to the agency for

13    consideration of this new evidence.  The new evidence consists of treatment records and/or

14    reports from 2007 and 2008.

15        A case may be remanded to the agency for the consideration of new evidence if

16    the evidence is material and good cause exists for the absence of the evidence from the prior

17    record.  See Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 511-12 (9th Cir.

18    1987) (citing 42 U.S.C. § 405(g)).  In order for new evidence to be "material," the court must

19    find that, had the agency considered this evidence, the decision might have been different.  See

20    Clem v. Sullivan, 894 F.2d 328, 332 (9th Cir. 1990).  The court need only find a reasonable

21    possibility that the new evidence would have changed the outcome of the case.  See Booz v.

22    Secretary of Health and Human Services, 734 F.2d 1378, 1380-81 (9th Cir. 1984).  The new

23    evidence, however, must be probative of the claimant's condition as it existed at or before the

24    time of the disability hearing.  See Sanchez 812 F.2d at 511 (citing 42 U.S.C. § 416(i)(2)(G)).  In

25    Sanchez, the court concluded that the new evidence in question was not material because it

26    indicated "at most, mental deterioration after the hearing, which would be material to a new

18

1    application, but not probative of his condition at the hearing." <u>Id.</u> at 512 (citing <u>Ward v.</u>

2    <u>Schweiker</u>, 686 F.2d 762, 765-66 (9th Cir. 1982)).

3              In this case, the Appeals Council denied review on May 31, 2007, at which time

4    the ALJ's decision became the final decision of the Commissioner.  The court finds that the new

5    evidence is not material to the extent it covers dates after May 31, 2007.  Specifically, while

6    evidence after this date relates to the impairments discussed by the ALJ and at issue in this case,

7    it does not relate to plaintiff's condition at the time the case was before the agency.  As with the

8    new evidence in <u>Sanchez</u>, the new evidence here – treatment notes and/or reports after May 31,

9    2007 – at best relate to plaintiff's condition after the case was no longer pending in the agency.

10   Such evidence may be material to a new application for benefits, but does not provide an

11   independent basis for a remand on the application currently before the court.  As to new evidence

12   covering dates on or before May 31, 2007, the court finds that plaintiff has failed to show good

13   cause.  In particular, plaintiff has not stated why she did not seek to submit such evidence to the

14   agency for review by the Appeals Council.

15              For these reasons, the court finds that a remand based on new evidence is not

16   warranted.

17

18                         **III.  STANDARD OF REVIEW**

19              The court reviews the Commissioner's final decision to determine whether it is:

20   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

21   whole.  <u>See</u> <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

22   more than a mere scintilla, but less than a preponderance.  <u>See</u> <u>Saelee v. Chater</u>, 94 F.3d 520, 521

23   (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

24   support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971).  The record as a whole,

25   including both the evidence that supports and detracts from the Commissioner's conclusion, must

26   be considered and weighed.  <u>See</u> <u>Howard v. Heckler</u>, 782 F.2d 1484, 1487 (9th Cir. 1986); <u>Jones</u>

1   v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

2   decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

3   Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

4   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

5   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

6   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

7   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

8   Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

9   standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

10  Cir. 1988).

11

12                              **IV.  DISCUSSION**

13              In her motion for summary judgment, plaintiff argues:  (1) The agency improperly

14  rejected the opinion of her treating physician; (2) The ALJ improperly found plaintiff's testimony

15  not credible; and (3) the ALJ erred with respect to his analysis of the severity of plaintiff's

16  fibromyalgia.[4]  The court notes, as does defendant, that plaintiff's "arguments" are entirely

17  conclusory.  They consist of nothing more than a recitation of applicable legal standards followed

18  by the contention that the ALJ failed to adhere to those standards in this case.  None of these

19  "arguments" is accompanied by an explanation or any analysis as to how the ALJ erred.  There

20  are no citations to the record to show that the ALJ erred.  Because plaintiff's motion consists

21  essentially of nothing more than conclusory statements that the ALJ erred, the motion could be

22  denied on that basis alone.  In the interest of justice, however, the court will independently

23  analyze the ALJ's decision in the three general areas identified by plaintiff in her motion.

24  / / /

25  _____

26      [4]      Plaintiff also argues that the court should consider the newly submitted evidence.
    That argument is addressed above in section II.B.

1

**A.**   **Evaluation of the Medical Opinions**

2              The weight given to medical opinions depends in part on whether they are

3   proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

4   821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

5   professional, who has a greater opportunity to know and observe the patient as an individual,

6   than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

7   (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

8   to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

9   (9th Cir. 1990).

10              In addition to considering its source, to evaluate whether the Commissioner

11   properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

12   in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

13   uncontradicted opinion of a treating or examining medical professional only for "clear and

14   convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

15   While a treating professional's opinion generally is accorded superior weight, if it is contradicted

16   by an examining professional's opinion which is supported by different independent clinical

17   findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

18   1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

19   rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

20   81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

21   the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

22   finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

23   legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

24   professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

25   without other evidence, is insufficient to reject the opinion of a treating or examining

26   professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

1   conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

2   1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

3   see also Magallanes, 881 F.2d at 751.

4          Plaintiff's argument, in its entirety, is as follows:  "The ALJ fails to meet with

5   legal burden required to dismiss the treating physician's determinations."[5]  With respect to the

6   weight given the various medical opinions in reaching his residual functional capacity finding,

7   the ALJ stated:

8          In making this determination, the undersigned gives great weight to the
           conclusions and findings of the state agency physician.  The findings of
9          Dr. Seymour, Dr. Petersen, and Dr. Miller also support those conclusions.

10  The court's review of the CAR reflects that Drs. Petersen and Gollober, among others, were

11  treating physicians.  The ALJ accepted Dr. Petersen's opinions.  As to Dr. Gollober, the ALJ

12  stated:

13         The undersigned finds that the statement of Dr. Gollober that the claimant
           needs to rest for at least ten minutes every hour is not credible as it is
14         inconsistent with Dr. Gollober's previous findings.  Further, it appears she
           just made a list of every diagnosis ever made on the claimant and did not
15         acknowledge or consider that many of these conditions are resolved and/or
           are not causing limitations.
16

17  The only medical opinion rejected by the ALJ was Dr. Gollober's opinion that plaintiff required

18  rest breaks of at least ten minutes every hour.

19         Because this opinion was contradicted in that no other doctor expressed this

20  limitation, the question is whether, in rejecting Dr. Gollober's opinion, the ALJ provided specific

21  and legitimate reasons which are supported by the record.  The court finds that the ALJ's

22  conclusion is supported by sufficient reasons and substantial evidence.  In particular, the court

23  agrees with the ALJ that "Many of [plaintiff's] conditions are resolved and/or are not causing

24  ────────────────────

25         [5]      Plaintiff refers to a single treating doctor, but does not identify which doctor this
    is.  She does not even reference the names of any doctors in her summary of the medical
26  evidence.  Nor does she state with any specificity or citation to the record how the ALJ erred with
    respect to evaluation of the medical opinions.

1   limitations." Plaintiff's GERD and related problems were under control with medications, with

2   occasional flare-ups which were well-managed.  Similarly, plaintiff's allergic rhinitis was also

3   under control with medications.  Plaintiff's rotator cuff problems were resolved with surgery and

4   any residual shoulder pain was related to fibromyalgia pain syndrome and not to any

5   physiological problem.[6]  There is evidence that plaintiff's depression and anxiety were controlled

6   with medication and did not result in any work-related limitations.  Her problems related to

7   kidney stones were also intermittent, under control, and did not result in functional limitation.

8   And, while it appears that plaintiff may have been developing problems related to carpal tunnel

9   syndrome during the time her case was pending before the agency, there is no objective medical

10  evidence that those problems ever became severe or caused functional limitations.

11          The court also agrees with the ALJ that Dr. Gollober's opinion that plaintiff must

12  rest at least ten minutes every hour is inconsistent with the doctor's own treatment notes and

13  other findings.  Dr. Gollober expressed this opinion in the December 2004 letter.  However, in

14  July 2004, Dr. Gollober reported that plaintiff had been doing part of her daughter's paper route.

15  Dr. Gollober's notes from November 2005 reveal that this involved walking about one-and-one-

16  half hours at a time.  Further, in January 2005 Dr. Gollober reported that plaintiff was doing

17  aerobic exercises, walking about one hour per day, and that plaintiff stated she was feeling better.

18  These observations are inconsistent with Dr. Gollober's December 2004 opinion.[7]

19  / / /

20  / / /

21

22          [6]      Nonetheless, the ALJ included a limitation to overhead reaching.

23          [7]      Another notable inconsistency in Dr. Gollober's notes relates to medications.   In
24  October 2003, plaintiff reported to Dr. Gollober that ". . . Vicodin works for her chronic pain in
    her neck, back, and shoulders. . . ."  However, later records from Dr. Gollober throughout 2004
25  and 2005 reveal that, on the one hand, plaintiff's medications were continually increased but, on
    the other hand, Dr. Gollober repeatedly expressed the concern that plaintiff was becoming too
26  dependent on narcotic pain medication and stated that she did not think medication was the best
    way to treat plaintiff's fibromyalgia.

1          While the court concludes that the ALJ's rejection of Dr. Gollober's opinion that

2     plaintiff requires rest breaks every hour is supported by proper legal reasons and substantial

3     evidence, this is not to say that this limitation does not in fact exist.  As discussed above, the

4     ALJ's reasons for rejecting the doctor's opinion were:  (1) it did not account for many conditions

5     which had been resolved or did not result in limitation; and (2) it is inconsistent with the doctor's

6     other findings.  These reasons are supported by the record, in particular the inconsistencies within

7     Dr. Gollober's treatment notes.  The ALJ did not reject Dr. Gollober's opinion as unsupported by

8     the evidence as a whole.  Therefore, the court does not express any opinion on that question.

9          **B.    Analysis of Plaintiff's Fibromyalgia**

10          In order to be entitled to benefits, the plaintiff must have an impairment severe

11     enough to significantly limit the physical or mental ability to do basic work activities.  See 20

12     C.F.R. §§ 404.1520(c), 416.920(c).   In determining whether a claimant's alleged impairment is

13     sufficiently severe to limit the ability to work, the Commissioner must consider the combined

14     effect of all impairments on the ability to function, without regard to whether each impairment

15     alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir.

16     1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment,

17     or combination of impairments, can only be found to be non-severe if the evidence establishes a

18     slight abnormality that has no more than a minimal effect on an individual's ability to work.  See

19     Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.

20     1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the

21     impairment by providing medical evidence consisting of signs, symptoms, and laboratory

22     findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone

23     is insufficient.  See id.

24     / / /

25     / / /

26     / / /

In her motion, plaintiff appears to assert that the ALJ erred with respect to his analysis of plaintiff's fibromyalgia.[8]   As to fibromyalgia, the ALJ stated:

> . . . She states she had five surgeries in two years and now has fibromyalgia and acid reflux. . . .  Her doctor thinks the problems are related to fibromyalgia and problems with her elbows. . . .  Her fibromyalgia was diagnosed by an allergist. . . .
>
> * * *
>
> A chiropractor, Phillip B. Schmidt, D.C., reported in April 2003 that the claimant has chronic myofascial pain that is treated with spinal manipulations.  (Ex. 4F).
>
> * * *
>
> In October 2003, the claimant admitted to Dr. Gollober that Vicodin works for her chronic pain in her neck, back, and shoulders but that she feels it makes her too sedated. . . .  For this reason, she has discontinued its usage. . . .  (Exs. 9F, 14F).
>
> * * *
>
> In January 2004, Dr. Gollober noted the claimant's pain complaints were reasonably controlled on her present medications.  She was not complaining of any side effects of medication.  In February 2004, Dr. Gollober noted the claimant continued to have fibrositis and might want to use an over-the-counter pain patch for relief.  Dr. Gollober stated, "As long as she remains in litigation, I suspect that we will continue to see her in the office with this complaint."  Dr. Gollober declined to do the functional assessment.  (Ex. 9F).
>
> A rheumatologist consultation in May 2004 by Diana Lau, M.D., . . . noted her generalized arthralgis and myalgia with multiple tender points were most consistent with fibromyalgia.  She was taken off pain medications and put on antidepressants and increased exercise.  In June 2004, Dr. Lau noted the claimant had self-discontinued all her medications as she felt

---

[8]     Plaintiff states in a section heading on page 25 of her motion that the "ALJ failed to comply with the Commissioner's policies in evaluating the severity of the claimant's fibromyalgia," but does not explain how.  In the body of her motion for summary judgment, plaintiff outlines SSR 99-2, which discusses chronic fatigue syndrome and recognizes an overlap between that condition and fibromyalgia.  Plaintiff does not, however, present any specific analysis of the ALJ's discussion of fibromyalgia.

     Nor does plaintiff challenge the ALJ's findings as to the severity of any of the other impairments listed by plaintiff in her motion for summary judgment.  Specifically, she does not challenge the ALJ's conclusions that plaintiff's GERD, allergic rhinitis, and mental impairments are not severe.  Nor could she because it is clear that no doctor ever opined that these problems constituted severe impairments or caused functional limitation.

they were making her sick.  She had also switched physicians so she could obtain pain medications as her other doctor wouldn't give her any.  The claimant complained of increased fibromyalgia symptoms to Dr. Gollober in July 2004.  Dr. Gollober mentioned to her that in all likelihood her best bet will not be more medications but more control of her personal situation.  Dr. Gollober noted she continued to complain[] of multiple physical maladies but still had no plan or program to take control of her life.  She was taking care of many stressful activities for her family, including doing part of her daughter's paper route.  The claimant told Dr. Lau in August 2004 that she didn't want to take any of the antidepressant medications that had been prescribed.  Dr. Lau encouraged the claimant to do an exercise program and didn't have anything else to offer her.

In a statement of December 2004, Dr. Gollober stated the claimant has . . . fibromyalgia. . . .

Plaintiff asserts that the "ALJ failed to comply with the Commissioner's policies in evaluating the severity of the claimant's fibromyalgia."  However, the ALJ in fact found that fibromyalgia is a severe impairment.  Therefore, even if the ALJ did not comply with the policies for evaluating the severity of fibromyalgia, any error did not harm plaintiff given that the ALJ reached a conclusion favorable to plaintiff's case that fibromyalgia is indeed a severe impairment.

To the extent plaintiff argues that the ALJ erred by concluding that this impairment was not disabling, based on the record which was before the ALJ at the time the ALJ issued his hearing decision, the court does not agree.  As the ALJ observed, plaintiff told Dr. Gollober in October 2003 that her pain was controlled with Vicodin and Dr. Gollober noted in January 2004 that her pain was controlled with current medications.  By May 2004, despite Dr. Lau's diagnosis of tender points consistent with fibromyalgia, the doctor took plaintiff off her pain medications.  By mid-2004 plaintiff had switched doctors to obtain pain medications, suggesting that they worked to control her pain symptoms.  Further, plaintiff's doctors have recommended that plaintiff engage on non-medicinal modalities to control her pain (i.e., aquatic therapy, physical therapy, self-hypnosis, relaxation techniques, etc.), but there is no evidence she ever did so other than walking.  And, despite plaintiff's complaints of chronic pain and her statements that she cannot walk for any extended period of time, she was doing part of her

daughter's paper route in 2004 and 2005, which involved a lot of walking.  In August 2004, Dr. Lau did not offer any treatment beyond suggesting that plaintiff engage in an exercise program.

This case is difficult to assess because, on the one hand, the record supports the ALJ's finding that plaintiff indeed suffers from fibromyalgia but, on the other hand, plaintiff's activities and course of treatment are not consistent with disabling pain due to fibromyalgia.  For example, as discussed above, plaintiff was walking for up to one-and-one-half hours per day in 2004 and 2005 (either as part of an exercise regimen or helping her daughter with the paper route).  This is not generally consistent with disabling pain and, specifically, with plaintiff's testimony at the administrative hearing in December 2004 that she can only stand for up to 20 minutes and walk for up to 25 minutes, after which she is "wore out."  While it is possible that plaintiff engaged in walking activities even though she was in pain, plaintiff does not explain the inconsistency.

Further, plaintiff's course of treatment, particularly in 2004 and 2005, reveal troubling features.  The records show that, over time, Drs. Lau and Gollober increasingly felt that medication was not effective in treating plaintiff's fibromyalgia pain.  However, during the same time, the dosages of plaintiff's medications were consistently increased to the point where Dr. Gollober became concerned about plaintiff's dependence on narcotic pain medication.  This inconsistency is also not explained.  The court is left to wonder – as the ALJ no doubt did – why plaintiff would continue to take increasing amounts of narcotic pain medication at the same time her doctors were advising her that such medication was not the way to control her fibromyalgia symptoms.  Plaintiff reported to her doctors and testified that exercise made her feel better, yet she continued with narcotic pain medications.  It is possible plaintiff developed an addiction to narcotic pain medication and that this explains why she sought increasing dosages and did not aggressively pursue other modalities for pain management.  This may also explain why plaintiff switched back to Dr. Gollober after briefly being treated in mid-2004 by Dr. Turkot, who would not provide plaintiff with Vicodin.

1    The court is most troubled by the letters submitted by plaintiff's family and

2  friends after the hearing decision was issued.  These letters recount the various limitations

3  associated with plaintiff's fibromyalgia pain and side-effects of her medications.  The letters,

4  obviously, were not part of the record before the ALJ.  However, they were part of the record

5  before the Appeals Council as it considered whether to review plaintiff's case.  Ultimately, the

6  Appeals Council declined further review without comment on any of the additional evidence –

7  including these letters – other than to say:  "We found that this information does not provide a

8  basis for changing the Administrative Law Judge's decision."  The Commissioner, acting

9  through the Appeals Council, did not comment on lay witness testimony presented in the form of

10  the letters.

11    In determining whether a claimant is disabled, an ALJ generally must consider lay

12  witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

13  919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

14  testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

15  evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

16  F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

17  of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

18  919.

19    The ALJ, however, need not discuss all evidence presented.  See Vincent on

20  Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain

21  why "significant probative evidence has been rejected." Id. (citing Cotter v. Harris, 642 F.2d 700,

22  706 (3d Cir.1981).  Applying this standard, the court held that the ALJ properly ignored evidence

23  which was neither significant nor probative.  See id. at 1395.  As to a letter from a treating

24  psychiatrist, the court reasoned that, because the ALJ must explain why he rejected

25  uncontroverted medical evidence, the ALJ did not err in ignoring the doctor's letter which was

26  controverted by other medical evidence considered in the decision.  See id.  As to lay witness

1    testimony concerning the plaintiff's mental functioning as a result of a second stroke, the court

2    concluded that the evidence was properly ignored because it "conflicted with the available

3    medical evidence" assessing the plaintiff's mental capacity.  Id.

4              In Stout v. Commissioner, the Ninth Circuit recently considered an ALJ's silent

5    disregard of lay witness testimony.  See 454 F.3d 1050, 1053-54 (9th Cir. 2006).  The lay witness

6    had testified about the plaintiff's "inability to deal with the demands of work" due to alleged

7    back pain and mental impairments.  Id.   The witnesses, who were former co-workers testified

8    about the plaintiff's frustration with simple tasks and uncommon need for supervision.  See id.

9    Noting that the lay witness testimony in question was "consistent with medical evidence," the

10   court in Stout concluded that the "ALJ was required to consider and comment upon the

11   uncontradicted lay testimony, as it concerned how Stout's impairments impact his ability to

12   work."  Id. at 1053.   The Commissioner conceded that the ALJ's silent disregard of the lay

13   testimony contravened Ninth Circuit case law and the controlling regulations, and the Ninth

14   Circuit rejected the Commissioner's request that the error be disregarded as harmless.  See id. at

15   1054-55.  The court concluded:

16             Because the ALJ failed to provide any reasons for rejecting competent lay
               testimony, and because we conclude that error was not harmless,
17             substantial evidence does not support the Commissioner's decision . . .

18             Id. at 1056-67.

19             From this case law, the court concludes that the rule for lay witness testimony

20   depends on whether the testimony in question is controverted or consistent with the medical

21   evidence.  If it is controverted, then the ALJ does not err by ignoring it.  See Vincent, 739 F.2d at

22   1395.  If lay witness testimony is consistent with the medical evidence, then the ALJ must

23   consider and comment upon it.  See Stout, 454 F.3d at 1053.  However, the Commissioner's

24   regulations require the ALJ consider lay witness testimony in certain types of cases.  See Smolen

25   v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); SSR 88-13.  That ruling requires the ALJ to

26   consider third-party lay witness evidence where the plaintiff alleges pain or other symptoms that

29

1  are not shown by the medical evidence.  See id.  Thus, in cases where the plaintiff alleges

2  impairments, such as chronic fatigue or pain (which by their very nature do not always produce

3  clinical medical evidence), it is impossible for the court to conclude that lay witness evidence

4  concerning the plaintiff's abilities is necessarily controverted such that it may be properly

5  ignored.  Therefore, in these types of cases, the ALJ is required by the regulations and case law to

6  consider lay witness evidence.

7          Clearly, because plaintiff's case involves fibromyalgia pain which by its nature

8  cannot be explained by objective clinical evidence, had the letters been part of the record at the

9  time the ALJ issued his decision, he would have been required to comment on them.  The

10  question is whether the same rule applies to the Appeals Council.  In Macri v. Chater, 93 F.3d

11  540 (9th Cir. 1996), the court concluded that the Appeals Council conclusion that new medical

12  evidence submitted after the ALJ's decision did not contradict the ALJ's conclusion because

13  evidence submitted after the hearing is less persuasive.  See id. at 544.  The issue in this case,

14  however, is not whether the letters are more or less persuasive.  It is whether the Commissioner –

15  through the Appeals Council – was required to comment on them as the ALJ would have been

16  had they been submitted before the hearing decision was issued.

17          Sousa v. Callahan, 143 F.3d 1240 (9th Cir. 1998), is instructive.  In that case, the

18  Appeals Council granted review of a prior ALJ decision because the claimant's mental

19  impairment may have hampered her ability to file a timely appeal of that decision.  See id. at

20  1242, n.2.  However, the Appeals Council did not hold a new hearing or remand the case to the

21  ALJ.  Rather, it considered the evidence itself and concluded that the claimant was not entitled

22  to benefits.  See id. at 1242.  The Ninth Circuit stated:

23          The Appeals Council's determination that Sousa was not disabled
        during the relevant time period was substantially based on an improper
24          rejection of lay testimony.

25          Id. at 1245.

26  / / /

1   The court directed the district court to remand the case to the agency for further proceedings.  See

2   id. at 1246.  From this, it would seem that the Appeals Council is required to properly consider

3   lay witness testimony.  This means that the Appeals Council was required to at least comment on

4   it.  Because the Appeals Council's decision denying review in this case is silent with respect to

5   the letters, it is impossible for this court to determine whether it properly rejected them.

6          A remand is appropriate to allow the agency to properly consider the lay witness

7   testimony provided in the form of letters from plaintiff's family and friends submitted after the

8   ALJ's April 2005 decision was issued.

9          **C.    Credibility Finding**

10         The Commissioner determines whether a disability applicant is credible, and the

11  court defers to the Commissioner's discretion if the Commissioner used the proper process and

12  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

13  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

14  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

15  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

16  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

17  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

18  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

19  1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

20  and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

21         If there is objective medical evidence of an underlying impairment, the

22  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

23  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

24  341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

25                 The claimant need not produce objective medical evidence of the
                   [symptom] itself, or the severity thereof.  Nor must the claimant produce
26                 objective medical evidence of the causal relationship between the

medically determinable impairment and the symptom.  By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the <u>Cotton</u> test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in <u>Cotton v. Bowen</u>, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See <u>Bunnell</u>, 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See <u>Smolen</u>, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use.  See <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See <u>Carmickle</u>, 533 F.3d at 1161 (citing <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989)).

Plaintiff argues:

There is nothing in the record to support the ALJ's conclusion that the testimony of the claimant is not fully credible or that the claimant's daily activities evidenced an ability to engage in substantial gainful employment.  The medical evidence is fully consistent with the symptoms and limitations to which the claimant testified.  Moreover, as set forth in <u>Smolen</u>, once a claimant meets the Cotton test and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if he makes specific findings stating clear and convincing reasons for doing so.  These are lacking in this decision from the commissioner.  This seems unreasonable given the testimony of Ms. Lane's about claimant's difficulties.

/ / /

/ / /

32

As to plaintiff's credibility, the ALJ stated:

> In making this [residual functional capacity] assessment, the undersigned has also considered the claimant's testimony of pain and inability to engage in work activity and finds her testimony not credible. The claimant stated she does minimal activities, i.e., cooks using the microwave, washes dishes for short periods of time, goes grocery shopping with the assistance of her mother, and drives only when necessary. This is inconsistent with her statements to Dr. Gollober that she regularly drives her daughter to a court-ordered parenting program and does part of her daughter's paper route. The claimant also successfully completed a vocational rehabilitation course in early 2003. (Ex. 8E, 9E). Such activities do not indicate a disabling impairment of the claimant's residual functional capacity for light work. No significant atrophy, neurological deficits, radicular pain, weakness, reflex absence, or decreased sensation were reported. The claimant has not participated in the treatment normally associated with a severe pain syndrome. She has self-discontinued medication on multiple occasions, does not have physical therapy, has not attended a pain management program, etc. Finally, the type, dosage, and side effects of medication employed to treat her impairment would not preclude her from performing work at a light exertion level. On the basis of the foregoing, the undersigned concludes [her] allegations of limitations are unsupported by the evidence.

Here, the ALJ's ultimate reason for rejecting plaintiff's credibility is that her stated limitations are "unsupported by the evidence." However, where there is evidence of an underlying impairment, the ALJ may not reject a claimant's testimony for this reason. See Bunnell, 947 F.2d at 347-48. In this case, the ALJ found that there was a severe underlying impairment – fibromyalgia – but cited the lack of objective medical findings to support plaintiff's testimony of pain. Because fibromyalgia, by definition, is a pain syndrome which is not explained by objective physiological problems, it was improper for the ALJ to reject plaintiff's testimony as unsupported by objective medical evidence.

To the extent the ALJ was imprecise and meant to say that plaintiff's testimony was not consistent with her daily activities and/or course of treatment, the court does not agree. The ALJ noted Dr. Gollober's reports that plaintiff "regularly drives her daughter to a court ordered parenting program and does part of her daughter's paper route." These activities are not necessarily inconsistent with disabling pain. One would expect that plaintiff would obey a court order despite her pain and limitations. Also, as revealed in plaintiff's objection to the ALJ's

33

1    hearing decision, she felt compelled to help her daughter with her paper route despite her pain.

2    And, just because she walked for up to one-and-a-half hours helping with the paper route does

3    not mean that she did not take frequent rest breaks during that period due to pain.  As to

4    plaintiff's completion of a vocational rehabilitation course in 2003, this pre-dated her hearing

5    testimony and worsening of her pain in 2004 and 2005.  Further, plaintiff's inability to procure

6    employment despite trying in 2003 could have been due to her pain and limitations.

7                As to plaintiff's course of treatment, the ALJ stated:  "The claimant has not

8    participated in the treatment normally associated with a severe pain syndrome."  He noted:  "She

9    has self-discontinued medication on multiple occasions, does not have physical therapy, has not

10   attended a pain management program, etc."  The record reveals, however, that plaintiff does not

11   have health insurance and essentially received subsidized medical care at Woodland Clinic

12   Medical Group.  This could explain why she was unable to obtain a referral or afford a separate

13   pain management program or physical therapy.  Further, while plaintiff did not participate in

14   formal physical therapy, she stated that she did what she could by walking and doing aerobic

15   exercises as her pain would allow.  As to discontinuation of medication, plaintiff has stated that

16   she did this because the side-effects were either making her condition worse or interfering with

17   her ability to function at a level sufficient to care for her children.

18               The ALJ also stated:  "Finally, the type, dosage, and side effects of medication

19   employed to treat her impairment would not preclude her from performing work at a light

20   exertion level."  The record does not support this conclusion.  First, there is no evidence in the

21   record as to the side effects of plaintiff's medication, if any.  Second, there is evidence in the

22   form of plaintiff's testimony and treatment notes that her medications did in fact produce side

23   effects.

24   / / /

25   / / /

26   / / /

Finally, as discussed above, plaintiff's family and friends submitted letters for consideration by the Appeals Council which tend to corroborate plaintiff's hearing testimony and other statements regarding pain and limitations.  This evidence has not been discussed at any level of agency review.  In addition to the letters, plaintiff submitted her own statement to the Appeals Council which explains many of the inconsistencies perceived by the ALJ.  Again, this evidence has not been discussed at any level of agency review.

## V.  CONCLUSION

As the court previously noted, this case is difficult to assess.  The court finds it odd that the ALJ would conclude that plaintiff suffers from fibromyalgia and that this impairment is severe, but also conclude that she is not limited functionally as a result of this condition.  The limitation to light work appears primarily based on restrictions on lifting, pushing, lifting, and reaching associated with plaintiff's shoulder problems.  The ALJ appears to have completely rejected any limitations associated with fibromyalgia.  Of course, the ALJ did not have the benefit of the additional evidence submitted to the Appeals Council and the Appeals Council did not provide any analysis of this evidence or remand for the ALJ to do so in the first instance.

This case is also difficult because plaintiff's attorney has presented a totally conclusory motion for summary judgment and failed to provide the court with any meaningful analysis of the facts and law.  However, the court finds that plaintiff should not suffer for the shortcomings of her counsel.  It should be noted that the remand recommended herein is the result of the court's independent analysis of the record and not plaintiff's counsel's presentation of the case to this court.[9]

---

[9]     Absent a stipulation to EAJA fees in this case, the court would be inclined to scrutinize any hours claimed by counsel to determine whether they are reasonable in light of the quality of the work product submitted to the court on plaintiff's behalf.

Based on the foregoing, the court concludes that this matter should be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above, as well as consideration of the additional evidence submitted after the ALJ's April 2005 decision but not discussed by the Appeals Council in its order denying review.  Accordingly, the undersigned recommends that:

       1.     Plaintiff's motion for summary judgment (Doc. 16) be granted;

       2.     The Commissioner's cross motion for summary judgment (Doc. 17) be denied;

       3.     This matter be remanded for further proceedings consistent with this order; and

       4.     The Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 6, 2009

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE